THOMAS EASTON CSB #109218
LAW OFFICE OF THOMAS EASTON
967 Sunset Dr
Springfield OR 97477
Tel: 541-746-1335
easton3535@gmail.com

JONATHAN H. LEVY CSB #158032
37 Royale Pointe Dr
Hilton Head SC 29926
Tel: 202-318-2406
Fax: 202-318-2406
jonlevy@hargray.com
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LIONEL LOMBARD, JR.,** | NO. |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT FOR DAMAGES** |
| **EMAAR USA,** **EMAAR PROPERTIES PJSC d.b.a. EMRILL SERVICES LLC, MOHAMMED ALI ALABBAR and DOES 1 to 100,** | Jury Trial Demanded |
| Defendants. | |

## I. INTRODUCTORY STATEMENT

1. Plaintiff Lionel Lombard, Jr., by and through his attorneys, alleges upon personal knowledge and belief as to his own circumstances, and upon information and belief (based on the investigation of counsel) as to all other matters, that substantial evidentiary support exists, or will exist after a reasonable opportunity for further investigation and discovery as a result of trial proceedings, in support of the following paragraphs.

2. Plaintiff Lionel Lombard has been subjected to grave violations of some of the most universally recognized standards of international law, including prohibitions against torture, cruel, inhuman, or other degrading treatment or punishment, arbitrary arrest and forced disappearance, confiscation of property and prolonged detention for exercising his universal right of freedom of speech, association, anti apartheid and assembly, at the hands of Defendants and their agents in the United Arab Emirate (referred to herein as "the UAE" or "Emirate").

3. To commit these violations of specific, universal, and obligatory standards of international law, defendants conspired with and provided their agents, corrupt UAE officials, with access to private e-mail records, copies of email messages, rental agreements, and confidential financial information about plaintiff and instigated false and malicious criminal and civil proceedings. This information, available only to the defendants, was voluntarily provided to UAE officials by defendants, its agents, alter egos, and/or other affiliated entities, including but not limited to wholly-owned subsidiaries of Emaar Properties. These disclosures and falsehoods served as the basis for the acts of persecution and torture that occurred as a direct result of the defendants' activities. By providing this false information to cooperative UAE. officials, defendants knowingly and willfully aided and abetted in the commission of torture and other major abuses violating international law that caused plaintiffs' severe physical and mental pain and suffering.

4. Plaintiff's claims are actionable under the Torture Victim Protection Act (TVPA) 28 USC § 1350 and 28 USC § 1331 because his injuries resulted from violations of specific, universal, and obligatory standards of international law as embodied in a number of treaty obligations binding on the United States and United Arab Emirate and implemented domestically here in the United States by a number of statutes.

5. Defendants' conduct also violates California state laws, including prohibitions against battery, false imprisonment, assault, intentional infliction of emotional distress, negligence, negligent supervision, and the California Business & Professions Code § 17200.

6. Plaintiff seeks general, compensatory, and punitive damages for his injuries and to

hold defendants accountable for their unlawful actions.

7. Plaintiff brings this action in California because the judicial system in the UAE is considered highly biased against non citizens and beholden to powerful interests like defendants. Further as will be demonstrated *infra*, plaintiff's initial and subsequent unlawful detention occurred as a result of his unsuccessfully seeking redress through the UAE courts. Moreover, defendant Emaar USA may be found in California and conducts substantial business here.

## II. JURISDICTION & VENUE

8. This court has jurisdiction over plaintiff's claims under 28 USC § 1331 (Federal Question Jurisdiction), 28 USC § 1332 (Diversity Jurisdiction), and 28 USC § 1350 (Torture Victim Protection Act). The Torture Victim Protection Act provides for federal court jurisdiction for acts of torture, as defined by 28 USC § 1350.

9. This court also has supplemental jurisdiction over claims arising from violations of state law because, pursuant to 28 USC § 1367, the facts in the claims arising from state law are so related to the plaintiffs' claims under federal laws that they form part of the same case or controversy under Article III of the United States Constitution. This court also has jurisdiction under the California long arm statute, California Civil Procedure Code § 410.10.

10. Venue is proper because Emaar USA is located in, does business in, and has major business contacts, corporate ties and engages in business activities in this district.

## III. PLAINTIFF

11. Plaintiff Lionel Lombard is a citizen of the United States and Louisiana and at all times relevant herein was a foreign resident of the UAE in Dubai or Abu Dhabi. Plaintiff was a partner in a business operating under the authority of the Dubai International Financial Centre. He sues on behalf of himself for the injuries, including severe pain and suffering, that he has endured as a result of his torture, cruel, inhuman, and other degrading treatment, and arbitrary arrest and prolonged detention inflicted upon him as a result of the defendants' actions conspiring with corrupt UAE government officials in committing these major human rights abuses.

12. Specifically, plaintiff Lionel Lombard was twice arrested and unlawfully and arbitrarily detained and maliciously prosecuted for plaintiff's emails, phone calls, in person protests, summoning the police and visits to the office of Emaar's Chairman, Mohamed Ali Alabbar, about racial discrimination against people of African descent at Emaar's The Springs development by Emrill Services, plaintiff's complaints about treatment of foreign workers by Emaar Properties and for communicating with other advocates including Mahmoud Ahmad, a UAE government attorney, and plaintiff's own attorney in Dubai, and the press about these issues.  He also sues for compensation of property seized by government officials in conjunction with his arbitrary arrest, forced disappearance and prolonged detention.

### IV.  DEFENDANTS

13. Defendant Emaar Properties ("Emaar") is a Dubai-based Public Joint Stock Company and one of the world's largest real estate companies.  Emaar Properties is perhaps best known for developing the world's largest skyscraper in Dubai, the Burj Khalifa.  Other Emaar projects include residential and commercial developments throughout the Middle East as well as in Europe, North Africa, North America, and Asia.  It is the developer of The Springs housing complex in Dubai, UAE in which plaintiff resided.  Emaar conducts business in the United States under the divisional name "Emaar USA" See **Exhibit 1** downloaded from Emaar.com on June 19, 2010 (www.beverlywestresidences.com).   It's most recent project is "Beverly West, " a 21-story, 35-unit luxury condo tower near the Los Angeles Country Club.

14. Emaar USA includes Emaar America Corporation which is wholly owned by Emaar Properties and is a Delaware corporation doing business on its own and through its own wholly owned subsidiary EJL Homes LLC based in Sacramento, California.  Emaar America has been used by Emaar Properties as a stalking horse in the bankruptcy liquidation of WL Homes and John Laing Homes, former subsidiaries of the Emaar USA division.  Emaar America Corporation's registered agent is in Sacramento and its main office is in California.  Emaar USA also includes Emaar LA Properties LLC, a Delaware corporation,

1  conducting substantial business in California.

2  15.  Defendant Mohamed Ali Alabbar is a citizen of the UAE and was at all times
3  herein the Chairman of Emaar Properties and Emaar USA.  Defendant Alabbar has visited
4  California to conduct business during the time relevant herein.  Plaintiff directed his concerns
5  directly to Alabbar because Alabbar was known to exercise direct control over all aspects of
6  Emaar in Dubai.

7  16.  Defendant Emrill Services LLC is a joint venture between Al Futtaim Group of
8  Dubai, Carillion PLC, a United Kingdom based construction company and Emaar and is
9  based in the UAE.  It was the security contractor for The Springs development in Dubai
10  during the times mentioned herein.

11  17.  Plaintiff is unaware of the true names and capacities of defendants sued herein as
12  DOES 1 - 100, inclusive, and therefore sues these defendants by such fictitious names.
13  Plaintiff will amend this complaint to allege their true names and capacities when
14  ascertained.  Plaintiff is informed and believes and therefore alleges that each of the
15  fictitiously named defendants is responsible in some manner for the occurrences herein
16  alleged, and that plaintiffs' injuries as herein alleged were proximately caused by such
17  defendants.  These fictitiously named defendants are herein referred to collectively as
18  "defendants."

### V.  STATEMENT OF FACTS

20  18.  The United Arab Emirate (UAE) is a federation of seven semiautonomous
21  emirates with a resident population of approximately six million, of whom fewer than 20
22  percent (one million) are citizens.  Citizens do not have the right to change their government.
23  According to the US State Department, torture is used by the government, and security
24  forces sometimes employed flogging as judicially sanctioned punishment.  Arbitrary and
25  incommunicado detention is a problem.  The judiciary lacks full independence.  The
26  government interferes with privacy and restricts civil liberties, including freedom of speech,
27  press (including the internet), assembly, association, and religion.

28  19.  Human rights advocates and advocates for non citizens in the UAE have been

subjected to a pattern of arbitrary criminal prosecution, imprisonment, and torture as a result of their expression of ideas that are perceived to be in opposition to the positions or policies of the government of the UAE on a variety of politically disfavored topics, such as democratic reform, human rights advocacy, opposition to corruption or disagreement with government policies generally.  As a result of the expression of their views, these "dissidents" are subjected to arbitrary arrest, criminal prosecution, and persecution in violation of numerous protections for fundamental rights involving the exercise of freedom of expression, association, press, anti apartheid and assembly under international law.

20. Flogging is a common punishment in the UAE.  Beatings administered by prison guards are also common.  The UAE constitution prohibits arbitrary arrest and detention; nevertheless, the government has held persons in official custody without charge or a preliminary judicial hearing.  The law permits indefinite, routine, incommunicado detention without appeal.  Under this procedure, the detainee may contact only an attorney at infrequent intervals.

21. According to the US State Department, societal discrimination against noncitizens is prevalent and occurs in most areas of daily life, including employment, education, housing, social interaction, and health care.  Both civil law and Shari'a criminalize homosexual activity, and Islamic religious law sets the death penalty as punishment for individuals who engage in consensual homosexual activity.

22. Emaar and its Chairman Alabbar are known to retaliate against criticism, real or implied.  In 2009 a Dubai newspaper, *7Days,* was banned not for the first time from Emaar owned and operated properties after criticizing Alabber.  In the past Emaar has been implicated in paying foreign workers extremely low wages, several years of indebtedness to recruitment agencies for fees that U.A.E. law says only employers should pay, the withholding of employees' passports, and hazardous working conditions that result in apparently high rates of death and injury.

23. Plaintiff's company, Inspiration Beyond Expectation Limited, was a public relations consultancy firm registered in the Dubai International Financial Centre (DIFC) as

company number 30 of which plaintiff was a founding director and corporate secretary. The company initially operated from plaintiff's villa at The Springs. As a result of his incarceration, plaintiff was forced to relinquish his shares in the company valued at over $100,000.

24. In December 2004 plaintiff leased a villa in The Springs, a property owned and managed by Emaar. Plaintiff is an African American male whose sexual orientation is discreetly homosexual. Initially, plaintiff encountered no problems at the Emaar property. However, coincident with plaintiff inquiring about the physical welfare of foreign construction workers to a supervisor at another Emaar property, The Meadows, plaintiff immediately found himself being treated differently by Emaar's newly installed security provider, Emrill Services, at The Springs beginning in February 2005 and continuing into 2006.

24. Emrill's Director of Security at The Springs was a white South African who paid no heed to plaintiff's inquiries and instead intensified the harassment of plaintiff with the intent to drive him out of The Springs along with the two remaining black families there.

25. Plaintiff also repeatedly complained to client relations at Emaar.

26. As a result of the persecution of plaintiff by Emrill which attempted to prevent plaintiff from entering The Springs, plaintiff was forced to summon the Dubai police on no less than three occasions in order to enter The Springs and reach his home.

27. Plaintiff visited and called the office of the Emaar Chairman, defendant Mohamed Alabbar on the advice of attorney Mahmoud Ahmad where he was advised not to mix in matters involving foreign construction workers or things would go badly for him. Plaintiff thereafter desisted from any inquiries along these lines. However, Emaar had already classified plaintiff as a dissident and reported this to Emrill Services which continued a policy of harassment against plaintiff.

28. The situation culminated in plaintiff being denied access to his residence each time he re-entered the The Springs unless he could prove he lived there to the satisfaction of Emrill personnel. Emaar and Emrill knew that plaintiff was a resident and initiated this

1  process to harass plaintiff.  Plaintiff complained to Alabbar, The Springs' the Owners
2  Association, the US Consulate and the Dubai police, yet the harassment did not stop but in
3  fact intensified.  Plaintiff was stalked and shadowed by Emaar security personnel whnever he
4  was at The Springs and The Meadows.  Several times Emrill security guards jumped out of
5  the bushes as he walked around the communal lake.  Also while plaintiff was sitting in Mc
6  Donalds or any restaurant in the community mall of the The Springs and The Meadows he
7  would be followed or stared at by passing Emrill security guards.  It was all a tactic to make
8  plaintiff feel as uncomfortable as possible.  Plaintiff's neighbors noticed and they questioned
9  why plaintiff was being harassed.
10         29.  The Springs' Owners Association indicated they did not want Africans living in
11  The Springs and plaintiff again complained and the Chairman of Emaar, Mohamed Alabbar,
12  responded that the they would look into the situation.
13         30.  In January 2006 plaintiff attempted to have a meeting with Emaar client relations
14  to discuss the problem with Emrill Services and reach a resolution.  Unknown to plaintiff, he
15  had been placed on an Emaar "blacklist" and had been singled our for persecution.  Emaar
16  agreed to the meeting but 20 minutes before the meeting was scheduled to begin they
17  cancelled by phone and referred plaintiff to the management of Emrill security.  There an
18  Emrill Services' manager, a New Zealander, clearly told plaintiff that he was  a "nigger" and
19  creating too many problems.
20         31.  Plaintiff  went to Emaar's main office in Dubai anyway, where the Emaar client
21  relations manager tried to calm the situation.  However plaintiff called the police.  He wanted
22  to press charges against all the people involved.  The police responded to Emaar and asked
23  plaintiff what was the problem; plaintiff explained the harassment and asked that the client
24  relations manager, and the Senior and Junior Manager of Emrill Services, and two other
25  Emaar staff be taken to the police station with him.  Several Emirati employees of Emaar
26  then started harassing and laughing at plaintiff.  They said he didn't look American and was
27  an African.
28         32.  At the police station plaintiff filled out a report with the help of a police

translator. When an Emirati lawyer friend of plaintiff, Mohamed Ahmad, came to the police station and read the report, he noted that it was inaccurate and made corrections.

33. Plaintiff hired a law firm, Berrymans Lace Mawer, and tried to press charges against Emaar and Emrill Services. However, after 5 months of court proceedings plaintiff himself was found guilty of harassing a woman and making sexually suggestive movements with his hand and for harassing the manager of Emrill, who also had called him a "nigger." Though there was no evidence to support the finding, it was made through the influence of defendants on the court system.

34. Plaintiff was jailed for three months in Dubai in the Summer of 2006. The *7Days*, the local newspaper, wrote about the incident and was temporarily banned from the The Springs and similar Emaar operated properties.

35. Plaintiff had to sign over the directorship of his company while in jail due to Emaar's influence over the DIFC. In addition plaintiff's credit was ruined as well. All plaintiff's bank accounts were frozen. When a friend went to bail out plaintiff, he was told that plaintiff was not American. Plaintiff was released October 1, 2006 after an overlong detention.

36. While in jail, Emaar sent a fax **(Exhibit Two)** of false allegations to plaintiff's landlord urging him to cancel the lease at The Springs. The landlord did not cancel the lease immediately but plaintiff began a gradual relocation to Abu Dhabi in Fall 2006. Plaintiff received a call from his landlord, an Iranian national, in October 2006 who wanted to determine plaintiff's intentions. The next day three men representing the landlord asked plaintiff to vacate the premises. Shortly thereafter plaintiff had a meeting with the government rent committee and the landlord's brother. The committee claimed some rent was past due, even though it was not, and the landlord's brother said that plaintiff must vacate the premises.

37. The landlord's brother showed plaintiff the fax from Emaar and indicated this was the reason plaintiff had to leave The Springs. He opened a folder and pulled out a fax and said he was sorry but that Emaar had put his brother up to it. The fax basically said

1  plaintiff's tenancy agreement was to be terminated.  The brother said that neither he nor his
2  brother had anything personal against plaintiff and that the rent was always paid on time.  He
3  was shocked to find out that Emaar put plaintiff in jail for three months because plaintiff had
4  complained about Emrill Services.  He gave plaintiff the two outstanding lease deposit
5  checks (blank checks that had been signed by plaintiff as security but not cashed as is
6  customary in the UAE) back to plaintiff and said he wanted nothing to do with this situation.
7  He was scared.   He also gave plaintiff the fax from Emaar, in English and Arabic.  However
8  the landlord did agree that plaintiff could leave some items in the villa as long as it was not
9  his primary residence.
10         38.  By 2007 plaintiff had relocated to Abu Dhabi due to Emaar shutting off the
11 electric and water to the villa, but the dispute with Emaar continued because the previous
12 incident had been widely publicized in the local press including *7Days* and the *Dubai Eye*.
13 Plaintiff visited the villa to find the Dubai Municipal employees in the driveway and they
14 told him to leave.  So he went to Emaar - to the second in charge - where the secretary, Ms
15 Lu or Ley, took plaintiff aside and told him to call the US Embassy in the UAE immediately.
16 She said she was sorry that they were acting this way but plaintiff's nationality was a
17 problem for Emaar as plaintiff had threatened to take legal action against Emaar in an email
18 to Emaar's Chairman Alabbar.
19         39.  Plaintiff then called the US consulate in Abu Dhabi and asked for help.  The
20 consulate official called the Dubai Municipality and told them to permit plaintiff access to
21 the villa at The Springs.  Plaintiff was permitted access to the villa but discovered that much
22 of his paperwork had been stolen by agents of Emaar and the property ransacked and
23 damaged.  The locks on the villa were eventually changed by March 2007 by Emaar or Emrill
24 Services to deny plaintiff access.
25         40.  Plaintiff let the matter drop and was promoting a new fashion label in Abu Dhabi
26 in 2008 but defendants had not forgotten the incidents which caused them embarrassment
27 and loss of face locally.  In May 2008 plaintiff  was arrested in Abu Dhabi at a business
28 meeting by the UAE CID (criminal investigative department).  They just asked his name and

for ID and told him he was wanted.

41.  Plaintiff learned he was arrested and his passport confiscated on the pretext that an investor in his new venture had complained but in reality plaintiff was wanted in Dubai due to a chain of events initiated by defendants.  Plaintiff was not taken to court not was he permitted access to consular officials.  Instead he was taken to the Abu Dhabi prison and confined in a section reserved for homosexuals in the prison cellar.  Plaintiff was questioned repeatedly by police as to who he was and where he was from.  Plaintiff protested he was a US citizen.  Plaintiff's nightmare was just beginning.  Plaintiff asked why he was detained and in turn was told by his captors that there was no record of him on file.  Plaintiff then realized that his jailing was not because of the purported financial dispute but due to defendants' influence.

42.  Three policemen came to plaintiff's cell  and told him they were taking him to call the US Embassy.  Instead they took him to an isolated room where a police officer painfully squeezed his scrotum and searched him.  Plaintiff was made to enter a cell without any shoes and then plaintiff was tortured for a week.

43.  Inside the cell was a concrete bed with no mattress or sheet.  Plaintiff was locked behind an iron door and a small window with bars.  His hands were handcuffed and painfully connected to ankle cuffs.  He was kept in these shackles for six days in a room that reached temperatures as hot as 120 degrees.  It was June, the hottest time in UAE.  He could not eat nor use the bathroom and the amount of water he was allowed was less then a liter during those six days.

44.  Every night the police would enter the cell and make sure the cuffs were tight and they would mock plaintiff about his race, sexuality and question his American nationality. Plaintiff was not allowed proper sleep the whole time he was in that room.  The police would bang on the doors and plaintiff was unable to lay down due to his shackles.

45.  On the fourth day of torture, US Embassy personnel came to see plaintiff.  When the cuffs were removed for him to go see them plaintiff found it extremely painful to walk and had deep marks on his wrists and ankles.  Plaintiff was limping when he met the US

official who came and appeared to be concerned. Plaintiff stated the Emiratis did not view him as an American because of his race and the consular official agreed.

46. According to the consular official, plaintiff was being held for a financial matter and one not really clear to them either. Plaintiff never received any paperwork for over a year and thus the debt, even if it had existed, could not be paid through a US Embassy donor program designed to address such cases.

47. Plaintiff complained he was being held in isolation and asked if they could have him removed from that cell. They said they would have him removed, but it only happened after an additional two days of torture. It was two weeks before plaintiff could walk properly again.

48. Plaintiff was released from Abu Dhabi Central Jail during the third week of August 2008 and transferred to Dubai Central Jail on August 19, 2008.

49. Plaintiff called the US Consulate who was unaware he had been sent to Dubai. Plaintiff was eventually permitted to meet with the consular representative Ms. Patricia Tabat in the warden's office while the warden was present.

50. Plaintiff informed Ms. Tabat he was being jailed due to retaliation by defendants. Tabat indicated that plaintiff was being held on account of his rent at The Springs had not been paid, which of course was untrue.

51. In September 2008, plaintiff finally was brought to Court and was denied bail. He was told that if he could pay $10,000 he would be released.

52. Until the day after Christmas 2008, plaintiff was held incommunicado and his relatives had no idea of his condition or exact whereabouts.

53. Plaintiff attempted to contact the State Department and Embassy; however, his letters did not result in any release. Further attempts to achieve bail were unsuccessful due to use of influence by defendants who did not want plaintiff released.

54. On December 7, 2009, plaintiff attempted to obtain a jail certificate from the jail administration at the request of the consulate; instead he was savagely beaten by six policeman on the orders of the warden.

1   55. Plaintiff suffered abrasions and bruises and was brutally chained and moved to a
2  punishment cell for three weeks.  He was restrained, denied proper food and water, medical
3  care or washing facilities.  Police came and taunted him verbally about his nationality, sexual
4  orientation and race during this time causing plaintiff to fear for his life.  The guards
5  threatened plaintiff's life and also made threats against President Obama and the First Lady.
6   56.  On February 3, 2010, all charges against plaintiff were dropped without
7  explanation and he was released from jail and shortly thereafter departed from the UAE.
8   56. At all times herein defendants acted as a joint tortfeasors with the direct actors in
9  committing the torts alleged in this complaint.  Defendants are vicariously liable for the
10 actions of their agents, servants, and joint venturers who were acting within the scope of thier
11 agency, venture, or conpiracy and whose actions are deemed to have been ratified by
12 defendants.
13  57. Prior to the filing of this complaint, defendants' Senior Legal Director, Mr.
14 Karam, was provided notice of these claims and an opportunity to investigate them.

### VI.  FIRST CAUSE OF ACTION
#### TORTURE

19  58. Plaintiff realleges and incorporates herein, as though fully set forth, the
20 allegations of all preceding paragraphs of the complaint.
21  59. Plaintiff Lionel Lombard has been tortured.
22  60. Defendants have caused, aided and abetted or ordered the torture of plaintiff.
23  61. Plaintiff has exhausted all viable remedies in Dubai.
24  62. As a result of defendants' aforesaid wrongful acts and violations of international
25 law, plaintiff  has been physically injured, suffered ongoing emotional and mental distress,
26 and loss to professional reputation.
27  63. The alleged acts of torture specifically violate the Torture Victim Protection Act
28 and plaintiff is therefore entitled to compensatory and punitive damages in an amount to be

determined at trial.

## VII. SECOND CAUSE OF ACTION

### CRUEL, INHUMAN, AND DEGRADING PUNISHMENT

64. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

65. As a result of defendants' aforesaid wrongful acts and violations of international law, plaintiff Lionel Lombard has been physically injured, suffered ongoing emotional and mental distress, and loss to professional reputation, due to the collusion of defendants and UAE official acting under color of law and in violation of international law to inflict cruel, inhuman, and degrading punishment upon him during his incarceration in the UAE.

66. These degrading, inhuman, and cruel punishments were inflicted upon plaintiff to punish him for confronting defendants regarding racism and discrimination at The Springs.

67. Defendants knowingly encouraged infliction of these punishments upon plaintiff and did nothing to mitigate their consequences.

68. Plaintiff is therefore entitled to compensatory and punitive damages in an amount to be determined at trial.

## VIII. THIRD CAUSE OF ACTION

### PROLONGED ARBITRARY DETENTION & FORCED DISAPPEARANCE

69. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

70. The arbitrary arrest of plaintiff Lionel Lombard, his long term detention, and being held incommunicado at times was in retaliation for his speech and actions against racism and discrimination by defendants.

71. Defendants colluded with UAE government officials to inflict physical and mental suffering upon plaintiff and the confiscation of his passport.

72. While plaintiff was incarcerated his father died and his mother was unaware of his whereabouts. As a result of his detention, plaintiff suffered emotional and mental distress, loss to professional reputation, and loss of his business.

73. Plaintiff is therefore entitled to compensatory and punitive damages in an amount to be determined at trial.

### IX.  FOURTH CAUSE OF ACTION

#### BATTERY

74. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

75. Defendants' agents committed acts of battery upon plaintiff including beatings and infliction of painful mechanical restraints which caused grave physical harm to plaintiff.

76. These acts, ratified and aided and abetted by defendants, constitute battery under the laws of California and the United States.

77. Plaintiff is therefore entitled to compensatory and punitive damages in an amount to be determined at trial.

### X.  FIFTH CAUSE OF ACTION

#### ASSAULT

78. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

79. Defendants' agents committed acts of assault upon plaintiff including credible threats of violence which caused emotional harm including fear to his life to plaintiff.

80. These acts, ratified and aided and abetted by defendants, constitute assault under the laws of California and the United States.

81. Plaintiff is therefore entitled to compensatory and punitive damages in an amount to be determined at trial.

### XI. SIXTH CAUSE OF ACTION

#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

83. Defendants' intended that plaintiff suffer emotional distress, or in the alternative recklessly placed plaintiff in a position where he would be subject to a high likelihood of

1  suffering emotional distress, by causing fraudulent and false legal charges to be brought
2  against plaintiff.
3      84.  These acts ratified and aided and abetted by defendants constitute intentional
4  infliction of emotional distress under the laws of California and the United States.
5      85.  Plaintiff is therefore entitled to compensatory and punitive damages in an amount
6  to be determined at trial.

### XII.  SEVENTH CAUSE OF ACTION
### FALSE IMPRISONMENT

9      86.  Plaintiff realleges and incorporates herein, as though fully set forth, the
10 allegations of all preceding paragraphs of the complaint.
11     87.  Defendants and their agents utilized force or threat of force to arbitrarily detain
12 Plaintiff without his consent.
13     88.  These acts ratified and aided and abetted by defendants constitute false
14 imprisonment under the laws of California and the United States.
15     89.  Plaintiff is therefore entitled to compensatory and punitive damages in an amount
16 to be determined at trial.

### XIII.  EIGHTH CAUSE OF ACTION
### NEGLIGENCE & NEGLIGENT SUPERVISION

19     90.  Plaintiff realleges and incorporates herein, as though fully set forth, the
20 allegations of all preceding paragraphs of the complaint.
21     91.  Defendants and their agents failed to use ordinary or reasonable care to avoid
22 injury and loss of property by plaintiff.  Further, defendants failed to properly supervise their
23 employees and staff resulting in further injury and loss to plaintiff including physical harm,
24 loss of property, and emotional distress.
25     92.  These acts, ratified and aided and abetted by defendants, constitute negligence
26 under the laws of California and the United States.
27     93.  Plaintiff is therefore entitled to compensatory in an amount to be determined at
28 trial.

## XIV. NINTH CAUSE OF ACTION

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.

94. Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the complaint.

95. Plaintiff brings this action pursuant to California Business & Professions Code § 17204. Plaintiff is seeking to enforce important rights pursuant to California Code of Civil Procedure § 1021.5.

96. California Business & Professions Code § 17200 et seq. forbids unfair competition defined as any unlawful, unfair, or fraudulent act or practice.

97. Violation of the Torture Victim Protection Act, 18 USC § 2450 (outlawing torture), The Convention Against Torture & Other Cruel, Inhuman and Degrading Treatment or Punishment, Universal Declaration of Human Rights, UN Charter, laws of California and *jus cogens* international law constitute an unfair and unlawful practice by defendants.

98. Defendants seek to silence critics of their racist and exploitive business practices abroad by using torture and false imprisonment under color law. This in turn provides them an unfair advantage in California in that they are able to use unlawful means to stifle criticism abroad which might influence ethically minded customers in California.

99. Plaintiff seeks disgorgement of all profits derived from these unlawful practice pursuant to California Business & Professions Code § 17203.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

1. Find judgement against the defendants and for plaintiff;

2. Award plaintiff compensatory damages of $100,000 for loss of his business and $1,000 a day for his pain and suffering for approximately 610 days between his wrongful arrest in May 2008 and his release on February 3, 2010 for a total of $61,100,000;

3. Award plaintiff punitive damages in an amount equal to compensatory damages;

4. Order defendants to disgorge any profits earned through unfair practices under California Business & Professions Code § 17200 et seq;

1      5. Award plaintiff the costs of this action, including attorney and expert fees; and
2 other reasonable expenses;
3      6. Grant such other and further relief as shall seem just to the Court.
4 DATED:   July 7, 2010.

                                      s/ Thomas Easton, Esq.
                                      THOMAS EASTON     .

                                      s/ Jonathan Levy, Esq.
                                      JONATHAN LEVY
                                      Of Attorneys for Plaintiffs

## VERIFICATION

The undersigned LIONEL LOMBARD, JR., a citizen and resident of New Orleans, Louisiana, declares under penalty of perjury of the laws of the State of California and the United States, that he is the Plaintiff, and that he has read the allegations of the verified complaint and that the allegations therein are true as to the best of his knowledge.

DATED July 5, 2010.

                                            ___s/ Lionel Lombard Jr_____
                                            LIONEL LOMBARD JR.